IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOHNNY M. BUSH, JR., on behalf of himself and the class he seeks to represent, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Case No. CLASS ACTION JURY DEMAND |
| HONDA DEVELOPMENT & MANUFACTURING OF AMERICA, LLC, | ) ) ) ) | |
| Defendant. | ) ) | |

## COMPLAINT

**I.** *NATURE OF COMPLAINT*

1.     This action is brought by Plaintiff, Johnny Bush, Jr., ("Plaintiff"), an African American, current employee of Honda Development & Manufacturing of America, LLC ("HDMA" or "Defendant"). Plaintiff brings this action on his own behalf and on behalf of a putative class of exempt African American employees, associates and contractors who hold, perform or seek supervisory, managerial, administrative or other exempt positions, or who have held, performed or sought such exempt positions or duties during the applicable limitations period.

2.     Plaintiff and the putative class he represents seek a declaratory judgment that HDMA has engaged in a systemic pattern and practice of racial discrimination in employment opportunities in violation of: (a) Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. §§2000e, *et seq.* ('Title VII") and (b) the Civil Rights Act of 1866, as amended in 1991, 42 U.S.C. §§ 1981 and 1981a ("§1981"). Plaintiff and the putative class he represents also seek a

permanent injunction and other equitable relief necessary to remedy the effects of HDMA's and its predecessors' past and present racial discrimination and to prevent such discrimination from continuing to adversely affect his and putative class members' lives and careers, including, but not limited to, affirmative restructuring of HDMA's training, job assignment, promotion and compensation assessment and selection process, and other terms and conditions of employment. Plaintiff and the putative class he represents further seek a judgment for back-pay and other equitable and legal remedies necessary to make them whole, including, but not limited to, attorneys' fees and reimbursement of the costs and expenses incurred in prosecuting this action.

## II.    *JURISDICTION AND VENUE*

3.    This Court has jurisdiction pursuant to 28 U.S.C. §§1331, 1343(4), and Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§2000e, *et seq.*, as amended.

## III.    *CONDITIONS PRECEDENT TO SUIT UNDER TITLE VII*

4.    Plaintiff, Johnny Bush, Jr., has fulfilled all precedent conditions necessary to the institution of this action under Title VII.  Plaintiff's claims arising under 42 U.S.C. §1981 do not require administrative exhaustion.

## IV.    *PARTIES*

5.    Defendant Honda Development & Manufacturing of America, LLC is a corporation doing business in the State of Alabama.  HDMA is an employer as defined by 42 U.S.C. §2000e(b). It is also subject to suit under 42 U.S.C. §1981, as amended.  HDMA maintains either actual or constructive control, oversight, or direction over the operation.

6.    Plaintiff, Johnny Bush, Jr., is an African American employee of HDMA and citizen of the United States.

2

7.      This action seeks, in part, to enjoin Defendant from pursuing a pattern and practice of employment discrimination, including a battery of specific policies and practices that have injured and continue to injure the Plaintiff, and the putative class of African American employees based on their race and color.   Defendant has created and maintained a system-wide employment policy, pattern and practice of race-based disparate treatment and disparate impact which limits the employment opportunities of African Americans training, job assignment, promotion, transfer, training and compensation opportunities.

## V.      *STATEMENT OF FACTS*

8.      Prior to April 1, 2021, the Honda facility in Lincoln, Alabama was a separate independent entity incorporated as Honda Manufacturing of Alabama, LLC ("HMA"), and operated with its own organizational structure, policies, procedures, and employees.

9.      On April 1, 2021, Honda merged all of its automobile manufacturing facilities in the United States related to frame, engine, transmission, and related engineering and purchasing operations into a single multi-state entity formed and known as Honda Development & Manufacturing of America, LLC ("HDMA").

10.      All of the employees of the entities merged into HDMA immediately became HDMA employees and ceased being employees of any other Honda-related entity or facility, such as the former HMA facility in Lincoln, Alabama at which the named Plaintiff was employed prior to the merger.

11.      Nine separate manufacturing facilities were merged into HDMA as a single operation and corporate entity. Those nine manufacturing facilities included four plants in Ohio (the Maryville, East Liberty, Anna and Russel's Point plants) and five additional plants in Greensburg,

Indiana, Lincoln, Alabama, Timmonsville, South Carolina, Greensboro North Carolina, and Swepsonville, North Carolina.

12. Since merged, those nine facilities and entities have been operated and managed in common as part of a single, company-wide organizational structure and pursuant to common company-wide employment policies, practices and procedures.

13. For example, HDMA has a single, company-wide Supply Chain Division that operates in common throughout all nine of the merged automobile manufacturing facilities related to frame, engine, transmission, and related engineering and purchasing operations. That single Supply Chain Division in turn has five company-wide Departments that also operate in common throughout all nine merged facilities. Those five Departments are (1) Supply Chain Operations; (2) Supply Chain Packaging; (3) Production Control; (4) International Supply Chain; and (5) Supply Chain Delivery.

14. The named Plaintiff is part of that centralized organizational structure. He has responsibility for supervising and managing various subordinate employees and supply chain operations for HDMA's plants in Maryville and East Liberty, Ohio, Greensburg, Indiana, Lincoln, Alabama and the company's Performance Manufacturing Center ("PMC"). Plaintiff and his subordinate employees, however, are not stationed in, or required to report to, any such plants or local employees. Plaintiff's employees report directly to him and he reports, in turn, to the Unit Leader of the Packaging Fleet Maintenance Unit, David Reames. Reames reports to the current head or "Department Leader" of the Supply Chain Packaging Department, Shawnee Moseman. All such employees are part of HDMA's "Purchasing and Supply Chain Center" ("PSSC"), not any of its manufacturing facilities.

15.     Plaintiff currently has the title of Staff Administrator ("SA") in the Packaging Fleet Maintenance Unit of HDMA's Supply Chain Packaging Department. That Department has four such Packaging Units.  The Packaging Fleet Maintenance Unit consists of five Groups, each led by a Group Lead. Plaintiff is the Group Lead for the Supplier Account Management Group. All such Caucasian and non-African American Group Leads in the Packaging Fleet Maintenance Unit hold that position as a Staff Engineer ("SE"), while the Plaintiff has only been allowed to hold that same or similar Group Lead job as a Staff Administrator  ("SA"). The Staff Engineers are paid at a higher rate than the Plaintiff as a Staff Administrator.

16.     Each such Packaging Fleet Maintenance Unit operates on a company-wide basis with responsibilities for all nine of HDMA's automobile manufacturing facilities.  The subordinate employees who report to the Group Lead in each such Packaging Fleet Maintenance Unit are spread throughout HDMA's nine automobile manufacturing facilities.

17.     HDMA employees and associates are eligible to compete and be considered for promotion and transfer opportunities throughout HDMA regardless of location, department or the facilities for which they are responsible.

18.     Both before and since the merger of facilities and corporate entities to form HDMA, Plaintiff made his interest in competing and being considered for promotion and transfer opportunities regardless of the location, department or  facilities for which he would be responsible.

19.     Throughout the period since HDMA's formation and merger, the Plaintiff has been interested in and sought to be considered for assignment, promotion, transfer and training opportunities in positions as Unit Lead, Department Lead, Division Lead and/or other job opportunities at Career Levels 5 to 8.

20. Promotion and transfer opportunities at HDMA were not posted, announced or otherwise made known or available to the Plaintiff or the putative class before being filled.

21. HDMA promotes and transfers employees without posting the vacancy or opportunity or providing an application or bidding process that would allow the Plaintiff or the putative class of African American employees to know about, formally apply for or otherwise register or make known their interest in competing and being considered for HDMA promotion and transfer opportunities.

22. Plaintiff and the putative class were only able to learn of available positions and opportunities though informal "word-of-mouth" sources that are substantially less available to African Americans than their non-African American peers. Such "word-of-mouth" information disproportionately excluded or disadvantaged African American employees from knowing about and competing for positions and training that were traditionally filled by Caucasian and other non-African American employees.

23. The racially discriminatory impact of such word-of-mouth practices was compounded by HDMA's refusal to provide an open competitive application process that would allow African Americans to fairly compete on a race neutral basis.

24. Caucasian and non-African American employees and associates on the same or similar career path as the Plaintiff have been promoted at a faster pace to a higher-level positions despite Plaintiff's greater qualifications, leadership skills and technical contributions.

25. For example, the Plaintiff was interested in and sought to be considered for and promoted or transferred to Career Level 6 positions like, and including but not limited to, those given to his following Caucasian and non-African American peers:

6

- Richard Colmer's promotion to the Unit Lead for the Delivery Department after HMAD's formation and merger;
- Daniel Pace's promotion to Transportation Unit Lead as part of the Delivery Department on November 8, 2023;
- Phil Eisner's promotion or transfer to Unit Lead as part of the Planning Department after HMAD's formation and merger;
- Mark McKinley's promotion to the Crisis Management Unit Lead position on November 8, 2023;
- Eric Grieve's promotion to the Unit Lead position on July 17, 2024.

26.     There have also been additional Caucasian employees and associates promoted, transferred or assigned to other positions at Career Level 6 and above in the Supply Chain Division and other sectors of HDMA that were filled without Plaintiff knowing about them or having an opportunity to apply for or make his interest in such positions known.

27.     HDMA has routinely promoted and transferred Caucasian and other non-African Americans through various means without posting the vacancy or opportunity, providing an application or bidding process or otherwise considering or allowing the Plaintiff and putative class members to know about or compete for such promotion and transfer opportunities.

28.     HDMA's predecessor, HMA, initially hired the Plaintiff as an Associate Administrator in the Production Materials Control Department on April 29, 2002. Unlike the Caucasian and other non-African Americans promoted or transferred ahead of him, the Plaintiff has a technical degree in Management Information Systems from Auburn University. He also had greater and more varied experience in positions related to the ones he sought promotion to, including, but not limited to, greater years of service as a Procurement Operations Planner (2002-2006), Business & Systems Project Manager (2006-2013), Procurement Operations Manager (2013-2016), and Mass-Pro Packaging Manager in Alabama (2016-2020) and Regional Packing Supplier Account Manager as Group Leader.

29.     Plaintiff currently holds the position of Regional Packing Supplier Account Manager as Group Lead at Career Level 5 in HDMA's Fleet Maintenance Unit, which is part of the Supply Chain Packaging Department.

30.     All of Plaintiff's Caucasian and non-African American peers performing the same or similar job of Group Lead hold that position with the title and compensation of Staff Engineer ("SE") except for the Plaintiff who has only been assigned or promoted to Group Lead with the title and compensation of a Staff Administrator ("SA"). Those Caucasian and non-African American who were made Group Lead as an SE are paid at a higher rate than the Plaintiff who performs that same or similar Group Lead position as an SA because of his race.

31.     Based on his training, expertise and experience, the Plaintiff was fully qualified for the jobs and opportunities for which he was interested in and/or applied. Plaintiff gained such knowledge and qualifications by working shoulder-to-shoulder with a broad cross-section of Caucasian and other non-African American employees performing such jobs.

32.     Plaintiff and putative class members are personally knowledgeable of their own qualifications, training, experience, job knowledge, skills, abilities and other personal characteristics for the positions they have sought or held. Plaintiff also has knowledge of the training, experience, skills, abilities, job knowledge and other personal characteristics utilized for selecting and referring persons for such positions and job opportunities based on: (a) his employment at HMA and HDMA and active participation in HDMA's activities and affairs; (b) his experience with and knowledge of HMA's and HDMA's recruitment and selection criteria, practices and decisions; (c) the job experience, skills, abilities and other qualifications of employees performing the jobs and positions at issue; (d) HDMA's job descriptions, qualifications,

selection criteria and duties for the positions at issue; and (e) the job experience, skills, abilities and other qualifications of the persons recruited and selected for the positions at issue.

33.     Despite Plaintiff's qualifications for and interest in such promotions and transfers, he was not considered or selected for the leadership and supervisory positions or opportunities that he expressed interest in being promoted to or filling. Each such position and promotion opportunity the Plaintiff was interested in being considered or selected for was given instead to Caucasian or other non-African American employees as part of the pattern and practice of racial discrimination and disparate impact challenged in this action.

34.     HDMA's racial history, reputation and discriminatory practices challenged in this Complaint discouraged and deterred the Plaintiff and putative class members from further pursuing additional vacancies and job opportunities beyond those that they expressed an interest in filling.

35.     Rather than posting or announcing such promotion and transfer opportunities or providing an application or bidding process that would allow the Plaintiff and putative class members to know about and register their interest in being considered and competing for opportunities, HDMA has utilized several pretexts to circumvent or preclude African Americans from knowing about and fairly competing for such opportunities, including, but not limited to, an invisible and secretive selection process for: (a) "career succession" promotions and transfers; (b) upgrade or reclassification promotions or transfers to higher Career Levels or salary Grades; (c) Career Level promotions or transfers based on job class reevaluations; and (d) manager pre-selections and recommendations for Career Level promotions based on revised job descriptions designed to fit pre-selected candidates or made to appear to meet certain Career Level career criteria. Each of those means of circumventing or precluding an open competitive posting,

application and selection process have had disparate impact on the Plaintiff and the putative class of African Americans he represents.

36.     HDMA also circumvented and precluded the Plaintiff and putative class from knowing about and fairly competing for promotion and transfer opportunities through departmental and plant-based selection criteria and/or restrictions that favored employees in departments and/or facilities or locations that were disproportionately Caucasian and/or non-African American. Such departmental and plant-based recruitment and selection preferences and criteria had disparate impact on the Plaintiff and the putative class of African Americans he represents and otherwise discriminated on the basis of race.

37.     Such department and plant-based recruitment and selection preference and criteria had disparate impact on the Plaintiff and the putative class of African Americans in HDMA's "Purchasing and Supply Chain Center" where the Plaintiff works. That Center has 37 professional and managerial positions and employees, all of whom hold positions at Career Level 7 and above. African Americans, however, hold only two (5.4%) of those 37 upper- level positions in the Purchasing and Supply Chain Center even though they are 16.6% of HDMA's exempt professional and managerial employees. That racial disparity between a selection rate of 5.4% from a 16.6 % pool of eligible African American employees is statistically significant proof of disparate impact at this early, pre-discovery stage of notice pleading. That disparate impact is also based on, and caused by, the fact that HDMA has primarily drawn its exempt professional, managerial and support employees from its predecessors' Ohio plants that have been historically and disproportionately Caucasian and non-African American compared to the HDMA's other predecessors and its post-merger workforce as a whole.

38.     For example, HDMA's Purchasing and Supply Chain Center is headed by two "Center Leads" who have 16 Departments reporting to them, including nine Procurement Departments, five Supply Chain Departments and two Delivery Departments. Those nine Procurement Departments are headed by two Procurement Leads, six Division Leads and 13 Department Leads.  And similarly, the five Supply Chain Departments are headed by two Supply Chain Leads, two Division Leads and five Department Leads.

39.     HDMA's recruitment and selection process for all such exempt managerial, professional and support positions had a substantial disparate impact on African American employees because such positions were disproportionately, and almost exclusively, promoted from HDMA's racially skewed Ohio plants and departments even though they had no prior experience, duties or responsibilities for HDMA's other departments and plants in Lincoln, Alabama, Timmonsville, South Carolina, Greensboro North Carolina, Swepsonville, North Carolina and Greensburg, Indiana.

40.     Such racially disparate impact and treatment has also been caused, in part, by other criteria and components of HDMA's promotion and compensation selection process, including, but not limited to, assessing or requiring the following criteria:

- For mid-level Leader, Unit or Department Lead positions, 10 or more years prior experience, including at Career Level 5 and 6 with a "competency rating of 4 or above ('Frequently exceeds expectations in defined skills/behaviors.'");

- For entry-level Group or Unit Lead positions: 5 to 10 years of prior experience, including experience at Career Level 4 and 5 with a "competency rating" of 4 or above;

- For lower entry level leadership positions, 1 to 5 years prior experience, including experience at a Career Level 3 and 4 with a "competency rating" of 3 and above ("Consistently meets & occasionally exceeds expectations in defined skills/behaviors").

41.     Such use of prior experience as a promotion criterion has contributed to and caused disparate impact and disparate treatment of African American employees because they were first denied the opportunity to obtain such prior experience or and then were rejected or not considered for such positions because they lacked the very same experience and training that they had been denied because of their race, thereby freezing the status quo and perpetuating that past racial discrimination into the present.

42.     HDMA's employees have been predominantly and disproportionately Caucasian and non-African American during the period covered by this lawsuit.

43.     As a result, HDMA's recruitment and selection process perpetuated past and existing racial disparities in the jobs at issue.

44.     HDMA's selection rate of African Americans for such positions has been less than 80% of its selection rate for Caucasians and other non-African Americans. Virtually all of HDMA's employees who were able to satisfy such "prior experience" and "Career Level" criteria were Caucasian or non-African American.

45.     Plaintiff has observed the race of employees performing and promoted to jobs at issue during his more than 20 years working for HDMA and its predecessor, HMA. As part of his job, Plaintiff was able to observe the racial disparities in the employees performing or promoted to such jobs, including the disproportionate absence of African Americans. HDMA's selection rate of African Americans for those jobs was significantly less than their representation in the employee pool from which HDMA filled such positions, and also significantly less than 80% of the selection rate for Caucasians and non-African Americans for such positions. HDMA's racially disparate selection and promotion of employees had its genesis in HDMA's discrimination prior to the

12

merger of its automobile manufacturing facilities in 2021. As a result, HDMA's recruitment and selection process perpetuated such racial disadvantages and discrimination into the present.

46.     HDMA's performance rating and compensation criteria and procedures have also had disparate impact and otherwise discriminated against the Plaintiff and the putative class of African American employees by adversely affecting their compensation, promotion, transfer and training opportunities on the basis of race. The Plaintiff also has personal knowledge of the discriminatory obstacles and disparate impact experienced by other members of the putative class of African American employees in their effort to be considered or selected for similar promotion and training opportunities at HDMA.

47.     Other components of HDMA's selection and compensation criteria or procedures that may exist or have disparate impact on African Americans cannot currently be identified, known to exist or known to be "capable of separation for analysis", 42 U.S.C. §2000e-2(k)(B)(i)), at this pre-discovery, pleading stage of the case.

48.     HDMA further discriminated against the Plaintiff because of his race by classifying him as a SA and by giving him a 3 overall performance rating for having "consistently met and occasionally exceeded expectations."

49.     None of Plaintiff's Caucasian comparators have technical degrees or directly build technical tools for HDMA's use.

50.     Unlike the Caucasian and other non-African Americans promoted or transferred ahead of him, the Plaintiff created, developed, and implemented a new regional role in the supply chain division, including, but not limited to, developing roles, responsibilities, procedures, and the technical tools necessary to monitor and sustain such daily operational tasks which mitigated and avoided millions of dollars in supply chain expenses. He also simultaneously trained and

developed his team members with weekly one-on-one meetings which enhanced their professional development. That was not Plaintiff's only technical contribution and creation of valuable tools in the performance of his job for both HMA and HDMA that are still being utilized as part of HDMA's manufacturing and production process.

51.     HDMA's rating of Plaintiff's performance as a "3" did not reflect, and was inconsistent with, his true performance and contributions because of his race and color.  Contrary to HDMA's normal policies and practices, the Plaintiff was never given any specific reason or feedback as to why his performance and contributions were being cast in such a false light notwithstanding his repeated requests for such advice. Caucasian and non-African American were not treated in that manner. Plaintiff's performance rating and treatment, however, were directly contrary to HDMA's performance review standards in its Performance Management Regional Guide. Those standards state, among other things, that "the purpose of Performance Management is to establish a clear objective assessment…[through] a fair, equal, objective process to provide unbiased opportunities."

52.     HDMA's policies, pattern and practices have therefore denied the Plaintiff and putative class desirable job assignments, promotions, compensation, training, because of their race Plaintiff's and the putative class's race.

## VI. *CLASS CERTIFICATION*

53.     Plaintiff brings this action on his own behalf and on behalf of a putative class of exempt African American employees, associates and contractors who hold, perform or seek supervisory, managerial, administrative or other exempt positions, or who have held, performed or sought such exempt positions or duties during the applicable limitations period.

54.     HDMA's policies, pattern and practice and organizational structure set forth above are common to the Plaintiff and the putative class and otherwise satisfy the requirements of Federal Rule of Civil Procedure 23(a), 23(b)(2) and 23(b)(3).  The Plaintiff restates and incorporates by reference the facts stated in ¶¶4-23 above for purposes of certifying a class and/or subclasses pursuant to the foregoing provisions of Rule 23.

55.     The relief sought to remedy the claims of the named Plaintiff is typical of the relief necessary to remedy the parallel claims of the putative class.

56.     The putative class defined above is too numerous to make joinder practicable because it numbers substantially more than one hundred former, current, and future African American employees and associates.

57.     The named Plaintiff's interests are coextensive with those of the putative class and he is able and willing to fairly and vigorously represent such class. Plaintiff's counsel are also qualified, experienced, and able to conduct the litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity as required by Federal Rule of Civil Procedure 23(a)(4).

## VII.    *CAUSES OF ACTION*

### A.      *COUNT I: DISPARATE IMPACT*

58.     Plaintiff restates and incorporates ¶¶ 4-53 above as part of the facts  supporting this Count I of the Complaint with the same force and effect as if repeated verbatim herein. HDMA's promotion selection, training and compensation criteria and process set forth in ¶¶18-24 and 36-53 above have had disparate impact on the Plaintiff and the putative African American class he represents, including, but not limited to, HDMA's prior experience and leadership criteria and its refusal to post or announce vacancies or employment opportunities in a manner that allows African

Americans to learn about and compete for such job opportunities before they are summarily filled by Caucasians and or other non-African Americans. The racially disparate impact of HDMA's compensation and promotion selection criteria and procedures have adversely affected the Plaintiff's and the putative class members' job opportunities and compensation because of their race.

59.     The Plaintiff and putative class of African Americans were first denied the opportunity to obtain prior experience in the same way as non-African Americans and then were not selected for better positions and opportunities for not having the very experience that they had been denied because of their race. For substantial periods of time over the last ten years or more HDMA had disproportionately few African American in leadership, managerial, professional and administrative positions  Based on Plaintiff's observation and knowledge of such facts, HDMA's employees and promotions in such positions were significantly disproportionate to the number and pool of African Americans who were eligible and qualified for such positions and opportunities and were less than 80% of the selection rate of non-African Americans.

60.     In addition, such promotion selection, training and compensation criteria and procedures embody and incorporate the following practices which have disparate impact on the Plaintiff and the putative class members' job opportunities and compensation: (1) reliance upon procedures and criteria which facilitate permit and encourage racial stereotypes; (2) refusal to establish or follow policies, procedures, or criteria that reduce or eliminate disparate impact and/or intentional racial bias or stereotypes; (3) pre-selection of Caucasian employees, associates and/or contractors before vacancies or opportunities became known; and (4) discouragement of applications and expressions of interest by African Americans.

61.     HDMA had alternative promotion selection, training and compensation criteria and procedures available that would have served the same business purposes without discriminating on the basis of race to the same degree and with less disparate impact on African Americans, including, but not limited to, posting, announcing and/or advertising open positions and opportunities; providing a competitive application process; structuring objective, race neutral selection, training and compensation procedures and criteria; limiting consideration of prior experience to defined types, amounts and parameters that minimize disparate impact and perpetuation of past racial disparities in the manner required by the *Uniform Guidelines On Employee Selection Procedures,* 29 C.F.R. §1607.3(B), §1607.5 ("*Uniform Guidelines*"); actively monitoring racial disparities in promotion, training and compensation decisions and practices in the manner required by the *Uniform Guidelines,* 29 C.F.R. §1607.3, §1607.4 recording and maintaining the disparate impact data and information required by the *Uniform Guidelines,* 29 C.F.R. §1607.4; validating the components of its promotion, training and compensation criteria, decisions and practices that have disparate impact in the manner as required by the *Uniform Guidelines,* 29 C.F.R. §1607.5; and active consideration of less onerous alternative promotion selection, training and compensation criteria, policies, procedures and practices in the manner required by the *Uniform Guidelines*, 29 C.F.R. §1607.3(B).

62.     Based on the foregoing facts, HDMA's promotion selection, training and compensation criteria, policies, procedures and practices set forth at ¶¶4-53 above unnecessarily had disparate impact on the Plaintiff, the putative class and African Americans generally, thereby violating Title VII of the Civil Rights Act of 1964, as amended in 1991, and § 1981.

**B.      *COUNT II: DISPARATE TREATMENT***

63.     The facts, events and practices set forth in ¶¶4-53 of this Amended Complaint constitute racially disparate treatment of the Plaintiff and the putative class he represents.

64.     Plaintiff's facts stated in Count I establish a convincing mosaic of disparate treatment on the basis of race. Prior precedent permits the Plaintiffs to rely on the same or similar facts and evidence to plead both disparate impact and disparate treatment claims.

65.     The facts set forth in ¶¶18-24 paragraphs above also establish that Plaintiff and putative class members made known their interest in being considered for, selected and promoted to such positions and opportunities made available to and/or filled by offered that were Caucasians and/or other non-African Americans; that Plaintiff and such putative class members were qualified for those positions and opportunities, and that they were not considered for, selected, or promoted to such positions or training and compensation opportunities despite their qualifications and even though HDMA continued to seek candidates to fill those positions or opportunities. A *prima facie* inference of racial discrimination is established by such facts.

66.     The facts set forth in ¶¶18-48 above similarly establish that plaintiffs made known their interest in being considered for, selected, or promoted to appointed to such positions and opportunities offered to or filled by Caucasians  or other non-Africans; that they were qualified for those positions and  opportunities;  and that they were not considered for, selected, or promoted to such positions and opportunities even though HDMA continued to seek candidates with those same or similar general qualifications A *prima facie* inference of intentional racial discrimination as a motivating factor is established by such facts regardless of whether that was HDMA's sole motive for the challenged disparate treatment of the Plaintiff and putative class or a mixed motive for decisions, policies and practices at issue.

67. Based on Plaintiff's and putative class members' training, experience and expertise set forth above, they were fully qualified for such promotions, training, compensation opportunities and other leadership and supervisory positions. *See* ¶¶29-48 above.

68. HDMA did not consider or select the Plaintiff and putative class members for leadership and/or supervisory positions or opportunities that they were interested in and qualified to fill and that were instead offered to or filled by Caucasians and other non-African Americans. *See* ¶¶18-34 above.

69. HDMA denied equal employment opportunities to the Plaintiff and putative class because of their race when it filled positions based on the foregoing pattern and practice of racial discrimination. For substantial periods of time over the last ten years or more, there were disproportionately few African Americans who were considered for, offered or selected to fill such "leadership" and other exempt positions or opportunities. *See* ¶¶36-48 above.

70. Plaintiff and the class he seeks to represent have been subject to systemic racial discrimination including, but not limited to, a pattern and practice of intentional discrimination and a battery of practices having unlawful disparate impact on their employment opportunities. *See* ¶¶4-53 above. The challenged racial discrimination includes a policy and practice of restricting African Americans' employment opportunities to the lower classification and compensation levels.

71. Such facts show that HDMA intended for its promotion selection, training and compensation criteria and process to have disparate impact on the Plaintiff and the putative African American class and African Americans generally.

72. Such selection and compensation procedures incorporate the following racially discriminatory practices: 1) reliance upon subjective procedures and criteria which permit and

encourage the incorporation of racial stereotypes and bias of a predominantly Caucasian managerial staff; 2) refusal to establish or follow policies, procedures, or criteria that reduce or eliminate disparate impact and/or intentional racial bias or stereotypes in decisionmaking; 3) refusal to post or announce vacancies or employment opportunities in a manner that allows African Americans to learn about such opportunities and compete for them before they are filled by Caucasian employees or applicants; 4) pre-selection of Caucasians before vacancies or opportunities become known; and 5) discouragement of applications and expressions of interest by African Americans through a reputation for racial bias, and unequal terms and conditions of employment in such areas as position assignments.

73. Among other injuries, such racially discriminatory practices deprived Plaintiffs of the opportunity to work in a race neutral environment and to supervise and/or be supervised by African Americans on the same basis as non-African Americans.

## VIII.    PRAYER FOR RELIEF

74. Wherefore, Plaintiff on behalf of himself and the putative class he seeks to represent request the following relief:

a. Acceptance of jurisdiction of this cause;

b. Certification of the case as a class action on behalf of the proposed plaintiff class defined above;

c. A declaratory judgment that HDMA's employment practices challenged herein are racially discriminatory and violate of Title VII and 42 U.S.C. §1981;

d. An injunction against HDMA and its officers, owners, agents, successors, employees, representatives, partners and any and all persons acting in concert with it prohibiting

such unlawful practices, policies, customs, usages and any resulting retaliation for prosecuting this action;

e.      An Order requiring HDMA to initiate and implement programs that (i) provide equal employment opportunities for African American employees; (ii) remedy the effect of Defendant's past, present and continuing unlawful employment practices; and (iii) eliminates the continuing effects of such discriminatory practices described above;

f.      An Order requiring HDMA to initiate and implement affirmative action and systems of promoting assigning, training, transferring, compensating African American employees in a non-discriminatory manner, including, but not limited to, an effective means of enforcing, monitoring, reporting, and retaining jurisdiction of such relief to ensure equal employment opportunity:

g.      An Order restoring Plaintiff and the class he seeks to represent to jobs, compensation, seniority fringe and other benefits that they he would now enjoy in the absence of HDMA's discriminatory policies, practices and decisions;

h.      An Order directing HDMA to adjust the wage rates and benefits of the Plaintiff and putative class members to the level they now enjoy but for such discriminatory practices;

i.      An award of back pay; front pay; lost job benefits; preferential rights to jobs, and other equitable relief necessary to make that Plaintiff and putative class members whole and restore them to their rightful place together with prejudgment interest for the lengthy delay in receipt of such relief;

j.      An award of nominal and punitive damages to deter further unlawful behavior and racial discrimination;

       k.     An award of litigation costs and expenses and reasonable attorney's fees for prosecuting this action and obtaining the foregoing relief on behalf of the Plaintiff and putative class members;

       l.     Prejudgment interest; and

       m.     Such other and further relief as the Court may deem just and proper.


## JURY DEMAND

**PLAINTIFF AND THE PUTATIVE CLASS HE REPRESENTS DEMAND TRIAL BY JURY ON ALL CLAIMS FOR WHICH A JURY IS ALLOWED OR REQUIRED**

Respectfully submitted,

s/Robert E. DeRose
Robert E. DeRose (0055214)
**BARKAN MEIZLISH DEROSE COX, LLP**
4200 Regent Street, Suite 210
Columbus, OH 43219
614/221-4221
Trial Attorney for Johnny M. Bush, Jr.

Gregory O. Wiggins, (*Pro Hac Vice* to be filed)
Robert L. Wiggins, Jr., (*Pro Hac Vice* to be filed)
Counsel for Plaintiff and the Class

OF COUNSEL:
**WIGGINS CHILDS PANTAZIS FISHER & GOLDFARB, LLC**
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
205/314-0500
205/254-1500 (fax)